UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JIMEEN WIGGINS,

                              Plaintiff,

    v.                                                    Case No.  1:21-cv-00077

PEOPLE INC.,

                              Defendant.

### PEOPLE INC.'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

       Pursuant to Rule 56.1 of the Local Rules of this Court, Defendant People Inc. submits the following statement of undisputed material facts as to which there is no genuine issue to be tried in support of its motion for summary judgment against Plaintiff Jimeen Wiggins.

**The Plaintiff's Employment with People Inc.**

       1.       People Inc. is a not-for-profit human services agency that provides a wide range of services to individuals with developmental disabilities.  Kelley Decl. ¶ 3.

       2.       People Inc is committed to equal employment opportunity and has vigorous non-harassment, anti-discrimination and reasonable-accommodation policies.  Kelley Decl. ¶ 3.

       3.       The Plaintiff began work with People Inc. in July 2012.  Kelley Decl. ¶ 4.

4. The Plaintiff last worked for People Inc. as a Primary Instructor at its Elmwood Day Habilitation program, which is housed in a large, former industrial building, with large classrooms and long hallways. Berta Decl. ¶ 3; Feinstein Decl. ¶ 7 and Exs. E and AA.

5. While the plaintiff was employed there, the program served about 110 individuals with a variety of physical and developmental disabilities that affected their ability to function in different ways. The program had about twenty-nine full-time staff members and five part-time staff members. Berta Decl. ¶ 3.

6. There were typically ten to twelve individuals per classrooms room who were supervised by two or three Primary Instructors, depending on the needs of the individuals in those rooms. Berta Decl. ¶ 4.

7. Primary Instructors in those classrooms report directly to a Day Supervisor. Berta Decl. ¶ 4.

8. A copy of the Plaintiff's job description as a Primary Instructor is attached as Exhibit F to the accompanying Feinstein Declaration.

9. According to their job description, Primary Instructors are responsible for, supporting individuals with developmental disabilities and assisting them with developing their social, volunteer, and career related skills. Among other things, they are tasked with planning, coordinating, and implementing meaningful activities on a daily basis, including community activities outside the building. They further assist the individuals with hygiene, eating, moving about the building, and passing medication. Berta Decl. ¶ 5; Feinstein Decl., Ex. F.

10. The Plaintiff acknowledges that the job description accurately summarizes her essential functions and responsibilities as a primary instructor. Feinstein Decl. ¶ 7 and Ex. E.

11. All Primary Instructors must obtain an annual Strategies for Crisis Intervention and Prevention certification, which allows them to physically assist someone in a crisis situation. Berta Decl. ¶ 6.

12. The minimum qualifications for this position include the "[a]bility to meet the physical requirements of the position when performing the following: standing, walking, sitting, bending, stooping, squatting, kneeling, and climbing." Berta Decl. ¶ 7; Feinstein Decl. ¶ 7 and Ex. F.

13. Primary Instructors are further assigned to classroom with a mix of individuals with different needs and abilities. They are not assigned to a single individual. Likewise, while Primary Instructors generally will work in the same classroom, they must be prepared to work different classrooms, depending on staffing needs. Berta Decl. ¶ 8; Feinstein Decl. ¶ 23 and Ex. Z.

14. Primary Instructors at the Elmwood Day Habilitation Program must also participate in daily arrivals and departures at the beginning and end of the work day. In the morning, Primary Instructors meet arriving individuals at the facility's entrance in order to escort them to their various classrooms at different locations around the facility. Conversely, at the end of the day, Primary Instructors escort individuals from the classrooms to the entrance in order to meet the busses and vans that transport them home. Berta Decl. ¶ 9.

15. Each of these activities typically lasts from an hour to an hour and half, during which Primary Instructors are largely on their feet. Berta Decl. ¶ 9; Feinstein Decl. ¶ 25 and Ex. BB.

16. While primary Instructors are sometimes able to pause to sit briefly during arrivals and departures, they cannot do so on a regular and predictable basis, as the flow of incoming and departing clients varies significantly from day to day, depending on how the vehicles transporting them arrive. Berta Decl. ¶ 9; Feinstein Decl. ¶ 25 and Ex. BB.

17. Primary Instructors likewise must be available to accompany individuals when they engage in frequent community activities outside the facility including shopping, visiting recreational facilities, participating in Meals on Wheels, which is available five days a week, and working with several garden groups, which is offered three days a week. Berta Decl. ¶ 10.

18. These activities typically last anywhere from one and a half to four hours. Berta Decl. ¶ 10; Feinstein Decl. ¶ 23 and Ex. Z.

19. During these activities, Primary Instructors are generally on their feet, as they must stay in close proximity to clients to support their individual needs. Berta Decl. ¶ 10.

20. For example, if an individual walks away from the group while shopping or engaging in another activity, the Primary Instructor has to stay with them to provide supervision and ensure their safety. Berta Decl. ¶ 10.

21. For these reasons, a Primary Instructor is not a "sit-down" job because Primary Instructors have to be available at all times to meet the varying needs of the individuals assigned to their classroom. Berta Decl. ¶ 11.

22. Given the job's essential functions, it is therefore effectively impossible to limit the time a Primary Instructor remains on their feet to less than thirty minutes, as they must

be available to address an ever changing, and somewhat unpredictable, array of client needs throughout the day. Berta Decl. ¶ 11.

**The Plaintiff Takes Medical Leave**

23. In April 2015, the Plaintiff took a medical leave of absence for plantar fasciitis and foot pain. People Inc. requested, and the Plaintiff provided, a medical certification which indicated that she was unable to engage in weight-bearing activities for a period of up to two months. Based on the certification, People Inc. granted the Plaintiff medical leave through June 8, 2015. Kelley Decl. ¶ 5.

24. On June 8, 2015, the Plaintiff returned to work with no restrictions. Kelly Decl. ¶ 6 and Ex. B.

25. After returning to work, the Plaintiff did not request any further accommodations after August 2015. Berta Decl. ¶ 12; Kelly Decl. ¶ 6; Feinstein Decl. ¶ 4 and Ex. B.

26. Her direct supervisor Berta repeatedly advised her to bring in a doctor's note when she complained of foot pain but the Plaintiff did not do so. Berta Decl. ¶ 12; Kelley Decl. ¶ 6.

27. The Plaintiff denies that her diagnosis of plantars faciitis affected her work performance during this period. The Plaintiff admits that People Inc. first learned of any restrictions after the agency requested verification that she could work without restrictions and she saw her physician on December 4, 2015, who then faxed paperwork to the agency. Feinstein Decl. ¶ 4 and Ex. B.

28. She likewise explains that People Inc. first learned of any restrictions after the agency requested verification that she could work without restrictions and she saw her physician on December 4, 2015, who then faxed paperwork to the agency. Feinstein Decl. ¶ 4 and Ex. B.

**The Plaintiff's Recurring Issues with Time and Attendance**

29. People Inc.'s corrective action process generally proceeds as follows: verbal warning, caution memo, formal warning, probationary memo, and termination of employment. A supervisor may issue either a caution memo or a formal warning to an employee on their own authority; the Human Resources Department, however, must approve any probationary memos that are issued. Kelly Decl. ¶ 7 and Ex. A at pgs. 86-87.

30. The Onsite Policies and Procedures for the Elmwood Day Habilitation Program that was applicable during the relevant period states that "regular attendance and punctuality are important, not only to your job performance and career development, but also to the operation of your work site and the morale of your coworkers, who depend on your valuable contribution." Kelly Decl. ¶ 8 and Ex. C at 2. "Call-ins should be kept to a minimum. If call-ins occur two or more times during a 30-day period, three times within the quarter, if there is a pattern to the call-ins, or call-ins occur immediately after/before holidays/Scheduled PTO corrective action will be taken." *Id.*

31. On December 5, 2014, the Plaintiff received a formal, written warning regarding unplanned absences, use of paid time off, and insubordination. Among other issues, the warning noted excessive unplanned absences during the months of October through December 2014 and repeatedly attempting to take paid-time off ("PTO") after having exhausted

her allotment of PTO. The warning also outlined specific performance objectives regarding the Plaintiffs' work attendance and other identified deficiencies and stated that "Failure to comply with the above objectives may result in further action up to and including termination of employment with People, Inc." The Plaintiff signed the Formal Warning, acknowledging that "I understand and respect policy . . . . I agree and will comply. . . ." Kelly Decl. ¶ 9 and Ex. D.

32. On January 16, 2015, the Plaintiff received a probationary memo regarding her attendance. The Probationary Memo noted that she had taken two call-ins on January 13 and January 14, 2015, without having sufficient PTO. Again, the probationary memo noted that "Failure to comply with the above objectives may result in further action up to and including termination of employment with People, Inc." Kelley Decl. ¶ 10 and Ex. E.

33. As discussed below in Paragraph 59, similar issues reoccurred in October and November 2015 when the Plaintiff again had five unplanned absences.

**The Plaintiff's Substantiated Mistreatment of a Client**

34. On October 21, 2015, People, Inc. received a report from a residential manager with Baker Victory Services, Kevin Jenkins. Kelley Decl. ¶ 12; Feinstein Decl., Ex. O, at Ex A at 1.

35. Jenkins reported that he witnessed the Plaintiff screaming at an individual with profound intellectual disability, autism, anxiety and other disorders in an inappropriate manner, whom she was driving home from People Inc.'s day program. The Plaintiff was loud enough that Jenkins could hear her screaming, from his office inside the residence, even though she was outside. *Id.*

7

36. People Inc. assigned Quality Improvement ("QI") Coordinator/Investigator Merja Kenola to investigate the matter. Kelley Decl. ¶ 13; Feinstein Decl., Ex. O (Kenola Aff.), at Ex A at 1. Kenola had worked in this capacity since approximately 2002, had prior training regarding investigative techniques and strategies, and periodically participated in continuing training programs. *Id.*

37. As part of her investigation, Kenola interviewed the Plaintiff, the affected individual, Jenkins, and a second Baker Victory Services staff member who overheard the incident. Kelley Decl. ¶ 13; Feinstein Decl., Ex. O, at Ex A at 2. Based on the interviews and other information available to her, Kenola determined that the Plaintiff had engaged in "Other Mistreatment." *Id.*

38. "Mistreatment" is defined as "conduct on the part of a custodian, that is inconsistent with the individual's plan of services, general accepted treatment practices, and/or applicable federal or state laws, regulations, or policies, and which impairs or creates a reasonable foreseeable potential to impair the health, safety or welfare of an individual receiving services." Kelley Decl. ¶ 13; Feinstein Decl., Ex. O, at Ex A at 3.

39. On November 20, 2015, Kenola completed her Investigative Report substantiating the allegations of mistreatment against the Plaintiff. Kelley Decl. ¶ 13; Feinstein Decl., Ex. O, at Ex A.

40. The Plaintiff admits that she was accused of mistreating an individual in October 2015 by a staff member of another agency and both she and her accuser were interviewed as part of the People Inc.'s internal investigation. Feinstein Decl. ¶¶ 8, 26 and Exs. G and CC.

41. On or about December 1, 2015, the Plaintiff's supervisor Berta received a copy of the Investigative Report substantiating the Plaintiffs' mistreatment of an individual. Berta Decl. ¶ 15.

42. People Inc. takes any allegation of abuse or mistreatment of any individual whom it serves very seriously and does not tolerate such conduct among its employees. Kelley Decl. ¶ 27.

43. The Plaintiff was one of seven similarly situated employees whom People Inc. discharged for substantiated allegations of abuse or mistreatment in 2016. Kelley Decl. ¶ 27 and Ex. F.

**The Plaintiff is Placed on Leave**
**Pending Review of Medical Documentation**

44. Several times during the fall of 2015, the Plaintiff told her immediate supervisor Stephanie Berta that she was having difficulty working arrivals and dismissals due to the walking involved. Berta Decl. ¶ 12.

45. In response, Berta advised the Plaintiff repeatedly that she should bring in a doctor's note if she was having issues performing her job duties. Berta Decl. ¶ 12.

46. Berta also checked with People Inc.'s Human Resources Department, which confirmed that she had been cleared to work without restrictions after she returned from medical leave in June 2015. Berta Decl. ¶ 12.

47. On December 1, 2015, the Plaintiff's supervisor Stephanie Berta, together with Program Director Beth Geyer, met with the Plaintiff, to review the findings of the Quality

Insurance investigation and her continuing attendance problems. Berta Decl. ¶ 16; Feinstein Decl. ¶ 27 and Ex. DD.

48.     During this meeting, the Plaintiff complained about foot pain. She also explained that she was experiencing a personal crisis due to several recent deaths among her family and friends. Berta Decl. ¶ 16; Feinstein Decl. ¶ 6 and Ex. D.

49.     On December 2, 2015, Geyer met with the Plaintiff again. Geyer explained that she had consulted with Human Resources, which had directed her to put the Plaintiff on administrative leave until she could provide documentation concerning any restrictions. Feinstein Decl. ¶¶ 9-10 and Ex. A at ¶ 6, Ex. H and Ex. K; Doc. No. 18 at ¶ 51.

50.     People Inc. placed the Plaintiff on administrative leave effective December 2, 2015 pending the receipt and review of medical information regarding her ability to perform her job duties. Berta Decl. ¶ 16.

51.     According to the Plaintiff's testimony at the State Division Public Hearing on October 3, 2018, Geyer "wanted me to get medical documentations filled out stating I could work with no restriction and I guess that I was healthy mentally because of the deaths that just occurred. So she wanted me to go to the doctor and make sure I got documentation that I would work with no restrictions." Feinstein Decl. ¶ 9 and Ex. H.

52.     On December 3, 2015, People Inc. provided the Plaintiff with a letter requesting that she have her physician complete an enclosed "Physician Medical Certification" (which included a description of her job duties) and advising her that she would remain on leave "pending receipt and review of the requested documentation." Feinstein Decl. ¶¶ 9-10 and Exs. H, I, J, P at Ex. A; Doc. No. 18 ¶ 55.

53. On December 7, 2015, the Plaintiff's physician, Pamela Reed, M.D., returned the completed certification. Dr. Reed indicated that the Plaintiff was not "able to perform the essential functions and meet the physical requirements identified in the attached job description" because she was "unable to stand for prolonged periods in the performance of her job duties." Feinstein Decl. ¶¶ 11, 14 Exs. L, M, and Ex P at Ex. B, ¶ 6. The certification further requested as an accommodation that the Plaintiff be permitted to avoid standing for more than 30 minutes at a time for at least six months to one year. Feinstein Decl. ¶¶ 11, 14 Exs. L, M, and Ex. P at Ex. B, ¶ 8.

54. People Inc.'s Benefits and Safety Manager, Catherine Guas, consulted with Program Director Geyer concerning the requirements for the Plaintiff's position. Feinstein Decl. ¶ 14 and Ex. P at pg. 2 (Guas Aff.).

55. Geyer explained that the restriction requested by the Plaintiff's physician conflicted with the essential functions of her job as a Primary Instructor, including arrival and dismissal duties, attending to individual hygiene, and lunch monitoring duties — all of which require standing for more than 30 minutes at a time. *Id*.

56. Shortly thereafter, Guas advised the Plaintiff that People Inc. was not able to accommodate her restrictions. *Id*. at 2-3.

57. Guas had no involvement in the agency's decision to discipline or terminate employees. *Id*. at 1.

**The Plaintiff's ESR and Termination**

58. If an employee's performance does not improve after receiving a performance memo, either the Human Resources Department or a supervisor may request an

Employee Status Review ("ESR") to discuss the performance concern and to discuss what if any action should be taken, including, but not limited to, issuing another probationary memo, transferring the employee to another shift or location, or taking additional action up to and including termination of employment. Kelly Decl. ¶ 19.

59. In October and November of 2015, the Plaintiff again had five unplanned absences in October and November 2015. These prompted her immediate supervisor Stephanie Berta to begin preparing a probationary memo, which she then submitted to Human Resource for approval in preparation for providing it to the Plaintiff. Berta Decl. ¶ 14.

60. After reviewing the draft memorandum, the Human Resources Department suggested that ESR might be appropriate. Kelly Decl. ¶ 20.

61. By this time, Quality Improvement Coordinator/Investigator Kenola had completed her November 20, 2015 Investigative Report substantiating the allegations of mistreatment of an individual with profound intellectual disability and autism by the Plaintiff. *Id.*

62. Additionally, ESR was appropriate because the Plaintiff had already received less than a year earlier a probationary memo concerning similar attendance issues and had been warned that any further non-compliance could be grounds for discipline. *Id.* ¶¶ 10, 20 and Ex. E.

63. Associate President of Day Habilitation Services, Pamela King, subsequently requested ESR review. *Id.* ¶ 20.

64. On December 22, 2015, Mary Beth Iwanski, Senior Vice President of Residential, Day/Vocational, and Behavior Programs, Jeffrey Metz, Associate Vice President of

Human Resources, and King met to conduct an ESR for the Plaintiff. *Id.* ¶ 21; Feinstein Decl. ¶ 15; Feinstein Decl., Ex. Q at ¶ 5 (Iwanski Aff.), Feinstein Decl., Ex. R at ¶ 6 (Metz. Aff.),

65.     At the ESR, and Iwanski, Metz, and King reviewed the Quality Insurance Investigative Report in which it was found that the Plaintiff engaged in "Other Mistreatment," the Plaintiff's two prior disciplinary memos, internal documents regarding her attendance and employment history, the draft probationary memo, and supervisory notes. Kelly Decl. ¶ 22; Feinstein Decl., Ex. Q at ¶ 8, Feinstein Decl., Ex. R at ¶ 9.

66.     After having reviewed the records provided them, Iwanski, Metz, and King determined that termination of Complainant's employment was appropriate based on the substantiated finding of mistreatment, her already having been placed on probation for her poor attendance earlier in the year, and the Plaintiff's failure to improve her behavior, even after being warned at the time of being placed on probation that continued misconduct could result in termination.  Kelly Decl. Aff. ¶ 24; Feinstein Decl., Ex. R at ¶ 11; Feinstein Decl., Ex. Q at ¶ 9. Iwanski, Metz, and King did not consider or discuss the Plaintiff's request for an accommodation or any information regarding her alleged disability during the ESR.  Feinstein Decl., Ex. Q at ¶ 12: Feinstein Decl., Ex. R at ¶ 15,

67.     At the conclusion of the meeting, Metz completed the Agency's ESR form.  On this form, he indicated that the ESR was requested based on the substantiated allegations of mistreatment, including yelling at an individual who received services through People Inc., the Plaintiff's attendance issues, a poor attitude towards individuals who received services through People Inc., and unprofessional communications with her supervisors.  Kelly Decl. ¶ 23; Feinstein Decl., Ex. R at ¶ 10 and Ex. A.

68. Kathryn Alterio, Vice President of Human Resources, and Rhonda Frederick, President and Chief Executive Officer, then reviewed the recommendation. They both agreed that the Plaintiff should be terminated. See Feinstein Decl., Ex. Q at ¶10, Feinstein Decl., Ex. R at ¶ 12,

69. Based on the ESR, Metz completed a termination form indicating that the Plaintiff was terminated for substantiated misconduct. While attendance was initially stated as the reason for termination and was a factor in the determination to terminate the Plaintiffs' employment, the ESR determined that the primary reason for her termination was the finding of substantiated mistreatment. As a result, Metz crossed out attendance and hand-wrote in substantiated mistreatment. Feinstein Decl., Ex. R at ¶ 14 and Ex. B.

70. On January 4, 2016, Employee Relations Manager Brita Kelley met the Plaintiff, together with Beth Geyer, to advise the Plaintiff that she was being terminated due to substantiated allegations of mistreatment and a record of her attendance concerns. Kelly Decl. ¶ 26.

71. At the State Division Public Hearing on October 3, 2018, the Plaintiff testified under oath that she believed that she was terminated due to her time and attendance and denied having any indication of any other motivation for her termination. Feinstein Decl. ¶ 5 and Ex. C.

72. At the State Division Public Hearing on October 3, 2018, the Plaintiff testified under oath that admitted under oath that she does not know who at People Inc. made the decision to terminate her. Feinstein Decl. ¶ 12 and Ex. N.

**The Plaintiff's Complaint to the State Division of Human Rights**

73.     On August 1, 2016, the Plaintiff filed a verified complaint alleging disability discrimination against People Inc. with the New York State Division of Human Rights (the "State Division"). The State Division then cross filed her Complaint with the United States Equal Employment Opportunity Commission ("EEOC"). Feinstein Decl. ¶ 2 and Ex. A.

74.     As in this action, the Plaintiff alleged before the State Division that People Inc. had discriminated against her due to disability and denied her a reasonable accommodation in connection with her termination from employment on January 4, 2016. *Id.*, Ex. A.

75.     The matter eventually progressed to two days of public hearing before Administrative Law Judge Martin Erazo, Jr., on October 3, 2018 and July 18, 2018. At the hearing, the Plaintiff had a full opportunity to put on evidence, present witnesses, and to cross examine. She further had the benefit of a Senior Division Counsel who advocated in her interest. *Id.*, ¶ 3.

76.     After carefully reviewing in detail the testimony and other evidence before him, ALJ Erazo concluded:

> Respondent presented a legitimate, non-discriminatory reason for placing Complainant on unpaid administrative leave on December 1, 2015. During the December 1, 2015 employee performance review meeting, Complainant became extremely upset and distraught to the point that Berta and Geyer did not believe is was safe for Complainant to stay on the premises until she received clearance from her doctor.
>
> Respondent also presented a legitimate, non-discriminatory reason for terminating Complainant's employment on January 4, 2016. On November 11, 2015, Respondent concluded an internal investigation that confirmed Complainant had engaged in the mistreatment of a client with a profound intellectual disability, autism, anxiety and psychiatric disorders. In addition,

15

> Complainant's pattern of poor attendance did not improve although Respondent gave her several written warnings.
>
> Complainant failed to show that Respondent's reasons for the unpaid administrative leave and dismissal were a pretext for unlawful discrimination. Complainant did not show that Respondent was motivated by discriminatory animus. Accordingly, these allegations of disability discrimination must also be dismissed.

Feinstein Decl., Ex. S at 14-15.

77. After providing all parties an opportunity to object, and having reviewed the objections, the State Division adopted the ALJ's Findings and issued a Final Order dismissing the Plaintiff's administrative Complaint. Feinstein Decl. ¶ 19 and Ex. T.

**The Plaintiff Unsuccessfully Appeals the Dismissal
of Her Administrative Complaint to State Court**

78. On November 26, 2019, the Plaintiff commenced a special proceeding in Supreme Court, Erie County seeking to vacate the State Division's Determination under Executive Law § 298. Feinstein Decl. ¶ 20 and Ex. U.

79. On October 22, 2020, Supreme Court dismissed the Plaintiff's Petition with prejudice. Feinstein Decl. ¶ 20 and Ex. W.

80. The Plaintiff commenced the current action on January 15, 2021.

Dated: Buffalo, New York
July 25, 2022

          **HODGSON RUSS LLP**
          *Attorneys for Defendant People Inc.*

          By:   s/Joshua Feinstein
                Joshua Feinstein
          140 Pearl Street, Suite 100
          Buffalo, New York 14202
          Telephone: (716) 856-4000
          *jfeinste@hodgsonruss.com*

003131.00116 Business 22730530v1